## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **PATRICK NAGORSKI** | § | |
| | § | |
| **V.** | § | **C.A. NO.: 4:23-cv-02860** |
| | § | |
| **HARRIS COUNTY, TEXAS** | § | |

## <u>PLAINTIFF'S RESPONSE TO DEFENDANT HARRIS COUNTY, TEXAS' MOTION FOR SUMMARY JUDGMENT</u>

TO THE HONORABLE DAVID HITTNER:

COMES NOW, Patrick Nagorski ("Plaintiff") and files this his Response to Defendant Harris County, Texas' Motion for Summary Judgment, and respectfully shows that it should, in all things, be denied.

# **TABLE OF CONTENTS**

EXHIBIT LIST…………………………………………………………………

TABLE OF AUTHORITIES……………………………………………………

    I.     SUMMARY OF THE ARGURMENT………………………….

    II.    KEY FACTS…………………………………………………….

    III.   STANDARD OF REVIEW……………………………………..

    IV.   ARGUMENTS AND AUTHORITIES………………………….

    V.    CONCLUSION…………………………………………………

## EXHIBIT LIST

Plaintiff's Response to Defendant Harris County, Texas' Motion for Summary Judgment is based on the following evidence in support of denial of said motion and Plaintiff incorporates the following Exhibits as if fully set out herein:

Exhibit 1:   Harris County Policies & Procedures (effective 11/25/17, last amended 1/25/21), HC 295-361

Exhibit 2:   Harris County Policies & Procedures (effective 3/12/22, last amended 9/13/22) and Patrick Nagorski ("Plaintiff") Signed Acknowledgement of receipt, HC 362-445 and HC 995

Exhibit 3:   Excerpts from Patrick Nagorski ("Plaintiff") Deposition taken June 25, 2024

Exhibit 4:   Excerpts from Seth Hopkins ("Hopkins") Deposition taken July 18, 2024

Exhibit 5:   Excerpts from Jamie Buchanan ("Buchanan") Deposition taken August 15, 2024

Exhibit 6:   Excerpts from Stan Clark ("Clark") Deposition taken July 17, 2024

Exhibit 7:   Excerpts from Natalie DeLuca ("DeLuca") Deposition taken July 18, 2024

Exhibit 8:   Excerpts from Pam Rea ("Rea") Deposition taken June 28, 2024

Exhibit 9:     Rea Affidavit dated February 12, 2024

Exhibit 10:   Plaintiff 2016 Performance Review, HC 687-694

Exhibit 11:   Plaintiff 2017 Performance Review, HC 670-679

Exhibit 12:   Plaintiff 2018 Performance Review, HC 661-669

Exhibit 13:   Plaintiff 2020 Performance Review, HC 654-660

Exhibit 14:   Plaintiff 2021-2022 Performance Review, HC 639-641

Exhibit 15:   Harris County Attorney's Office New Performance Review Process, with Plaintiff's Completed Harris County Job Analysis Questionnaire and Employee Self- Assessment 2021-2022, HC 1287-1290, HC 880-890 and 1287-1290

Exhibit 16:   Plaintiff's Response to 2021-2022 Performance Review, HC 642-649

Exhibit 17:   Email from Plaintiff to Hopkins, Clark, Laura Hedge ("Hedge"), 12/8/21, Subject Requesting FMLA or ADA Accommodation, HC 1273-1274

Exhibit 18:   Email Chain Between Hopkins, Clark, Hedge and Jonathan Fombonne ("Fombonne"), 12/8/21–12/10/21, Subject Requesting FMLA or ADA Accommodation, HC 1271-1272 and 1275-1279

Exhibit 19:   Email Response from Hopkins to Plaintiff's 12/8/21 Email, 12/10/21, Subject Requesting FMLA or ADA Accommodation, HC 2706

Exhibit 20:   Email Chain Between Plaintiff, Buchanan, Hopkins, Clark and Hedge,

12/10/21-12/13/21, Subject Requesting FMLA or ADA Accommodation, HC 219-223

Exhibit 21:  Email Chain Between Hedge, Hopkins and Clark, 12/10/21-12/16/21, Subject Employee FMLA/ADA, HC 2714-2715

Exhibit 22:  Email Chain Between Buchanan, Hopkins, and Clark, 12/16/21-12/29/21, Subject Employee FMLA/ADA, HC 814-816

Exhibit 23:  Email Chain Plaintiff (12/10/21), Buchanan Response (12/31/21) and Plaintiff Response (12/31/21), Subject Requesting FMLA or ADA Accommodations, HC 581-583

Exhibit 24:  Clark's Drafts of Performance Reviews to Hopkins, 12/22/21, HC 1713-1719

Exhibit 25:  717-731 Email Chain with ADA packet sent to Plaintiff, 12/30/21, HC 717-731

Exhibit 26:  Clark's Drafts of Performance Reviews to Hopkins, 1/6/22, HC 1720-1732

Exhibit 27:  Clark's Drafts of Performance Reviews to Hopkins, 1/11/22, HC 1733-1742

Exhibit 28:  Email Chain Between Plaintiff and Buchanan, 1/24/22, Denying ADA Accommodations, HC 586-587

Exhibit 29:  Email from Clark to Plaintiff, 1/26/22, Subject Flores Case, HC 1310-

1311

Exhibit 30:  Email Between Clark and Hopkins, 1/26/22, Subject Nagorski Performance Review, HC 1320-1323

Exhibit 31:  Email Chain Between Multiple People, 2/1/22, Subject Relativity – review Russell, HC 1332-1334

Exhibit 32:  Emails Between Plaintiff, Clark and Hopkins, 2/4/22-2/18/22, Subject Russell, HC 1347-1348

Exhibit 33:  Declaration of Darko Zdilar, M.D., Ph.D.

Exhibit 34:  Email/Fax with Attachments from Dr. Zdilar, 2/25/22, HC 734-749 (excludes actual medical records originally attached), Filed Under Seal

Exhibit 35:  12-16 Email from Buchanan Approving FMLA Leave from 2/28/22 to 3/11/22, 2/28/22, HC 12-16

Exhibit 36:  938 Email From Plaintiff to Clark, Hedge and DeLuca, 2/25/22, Subject Patrick Nagorski Upcoming Civil Service for March 2022, HC 938

Exhibit 37:  Email from DeLuca to Buchanan, Clark, and Kelsey Bowdoin ("Bowdoin"), 2/25/22, Subject Patrick Nagorski FMLA, HC 937

Exhibit 38:  Emails Between Clark, Plaintiff, Hedge, and DeLuca, 2/25/22, Subject Patrick Nagorski Upcoming Civil Service for March 2022, HC 939

Exhibit 39:   Email from Plaintiff, 2/28/22, Subject Absence To-Do, HC 952

Exhibit 40:   Email from Plaintiff to Clark and Hopkins, 2/28/22, Subject Russell, HC 1380

Exhibit 41:   Email from DeLuca to Plaintiff, Clark and Hopkins, 3/8/22, Subject Patel, HC 1789-1792

Exhibit 42:   Emails Between DeLuca and Buchanan, 5/19/22, Subject Patrick Nagorski, HC 1844-1846

Exhibit 43:   Email from Buchanan Approving FMLA Leave from 5/23-7/8/22, 5/23/22, HC 19-22

Exhibit 44:   Email/Fax with Attachments from Dr. Zdilar Related to Leave Granted in HC 19-22 (May to July Leave) (excludes actual medical records originally attached), Filed Under Seal – COMPARE WITH

FMLA Packet from Darko Zdilar, M.D., Ph.D. sent to Buchanan (Filed Under Seal), 5/17/22, HC 1847-1852

Exhibit 45:   Email Chain Between Plaintiff, Clark, DeLuca, and Hopkins Related to Performance Review, 4/27/22 to 5/6/22, HC 845-848

Exhibit 46:   Email from Buchanan that Plaintiff's Intermittent Leave is Approved, 6/7/22, HC 23-24 and HC 29-30

Exhibit 47:   DeLuca's 6/30/22 HC Position Statement to EEOC, HC 605-607 and HC 599-602

Exhibit 48:   Excerpts from Harris County American with Disabilities Act Training Materials, HC 1929-1945; HC 1954; HC 1960; HC 1967-1969

Exhibit 49:   Excerpts from Harris County Family Medical Leave Act Training; HC 1978; HC 1985-1986; HC 2014

Exhibit 50:   Harris County Resources & Risk Management Form – Interactive Process Record Form, PN 1206

Exhibit 51:   Email from Clark to Plaintiff, 7/9/22, Subject Assigning New Cases, HC 1030-1032

Exhibit 52:   Emails Between Hopkins and Plaintiff, 3/18/21-3/19/21, HC 1104-1106

Exhibit 53:   Emails Between Hopkins and Plaintiff, 4/20/21-4/22/21, HC 1126-1127

Exhibit 54:   Emails Between Plaintiff and Hopkins, 4/26/21-4/28/21, HC 1132-1133

Exhibit 55:   Email from Plaintiff to Hopkins, 4/30/21, HC 1136-1137

Exhibit 56:   Emails Between Hopkins and Plaintiff, 6/6/21-6/7/21, Subject Patel Easy Appeal?, HC 1051-1052

Exhibit 57:   Certified Copies of Patel Record from The 1st Court of Appeals – Houston, PN 1096-1124

Exhibit 58:   Certified Copies of Rollins' Pleadings, PN 1074-1095

Exhibit 59:  Email Chain Between Plaintiff, Rea, Clark and Hopkins, 8/11/21, Subject Rollins Dismissal, HC 1187-1190

Exhibit 60:  Rollins Appeal Drafted by Plaintiff, November 2021, HC 1673-1712

Exhibit 61:  Certified Copies of Casares' Pleadings, PN 1029-1073

Exhibit 62:  Email from Clark to Plaintiff, 10/19/21, Subject Casares Case, HC 1232-1233

Exhibit 63:  No Exhibit

Exhibit 64:  Plaintiff's Two Week Notice Email, 7/18/22, HC 32

Exhibit 65:  Kelsey Bowdoin's Notes from Plaintiff's Exit Interview, 8/9/22, HC 867-870

Exhibit 66:  Plaintiff's Resume Submitted to Harris County, HC 9

Exhibit 67:  Susana Sosa ("Sosa") State Bar of Texas Information, PN 1275

Exhibit 68:  Moustapha Gassama ("Gassama") State Bar of Texas Information, PN 1276

Exhibit 69:  Rea and Clark Texts, PN 995-997

Exhibit 70:  Plaintiff's Case List as of 7/18/22, HC 1019-1022

Exhibit 71:  Declaration of Patrick Nagorski, September 20, 2024

Exhibit 72:  Declaration of Allison H. Gabbert, September 20, 2024

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Celotex Corp. v. Catrell*, 477 U.S. 317, 323 (1986)

*Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021)

*Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)

*Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021)

*Loftin v. City of Prentiss*, 33 F.4th 774, 779 (5th Cir. 2022)

*Jones v. Gulf Coast Rest. Grp. Inc.*, 8 F4th 363, 369 (5th Cir. 2021)

*Shah v. VHS San Antonio Partners, LLC*, 985 F.3f 450, 453 (5th Cir. 2021)

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 1333, 150, 120 S.Ct. 2096,
    147 L. Ed. 105 (2000)

*Colony Life Ins. Co. v. Sanford*, 555 F.3d 777, 181 (5th Cir. 2009)

*Dickerson v. VA*, 2023 U.S. Dist. LEXIS 159042*16, 2023 WL 5837503

*E.E.O.C. v. LHC Grp., Inc.,* 773 F.3d 688, 697 (5th Cir. 2014)

*Campos v. Steves & Son, Inc.*, 10 F.4th 515, 521 (5th Cir. 2021)

*Hamilton v. Dallas County,* ---F.4th---, 79 F. 4th 494, 2023 U.S. App. LEXIS 21780,
    2023 WL 5316716 *5 (5th Cir. Aug. 18, 2023) (en banc)

*Dickerson v. VA,* 2023 U.S. Dist. LEXIS 159042, 2023 WL 5837503 *18

*Amedee v. Shell Chem., L.P.*, 953 F.3d 831, 837 (5th Cir. 2020)

*E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009)

*Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007)

*Chevron Phillips*, 570 F.3d at 621-22)

*Claiborne*, 690 F. App'x at 253

*Craven v. Blue Cross And Blue Shield*, 214 F.3d 1011, 1020 (8th Cir. 2000)


**Statutes:**

42 U.S.C. § 12112(a)

42 U.S.C. § 12111 (8)

**Rules:**

Fed. R. Civ. P. 56(a)…………………………………………………………..

Fed. R. Civ. P. 56(c)

SUMMARY OF THE CASE

Plaintiff's disability discrimination claims are more than supported by the evidence.  Defendant failed to provide reasonable accommodation and failed to engage in any meaningful interactive process.  Plaintiff does withdraw his claims under the FMLA.

## II.  KEY FACTS

### Plaintiff's Background – Legal and Military

Plaintiff is currently licensed and first became licensed to practice law in the State of Texas in 2010.  *Exhibit 3, page 7, lines 7-8 and 20-22.*

In addition to being passionate about being an attorney, Plaintiff is also a member of our nation's armed forces.  *Exhibit 71.*  As background, Plaintiff joined the military starting in 2002 as an Army ROTC cadet at the University of Notre Dame.  *Id.*  In 2005, he joined the Indiana Army National Guard's Simultaneous Membership Program and served as a part-time drilling member of an infantry unit in the Indiana National Guard while simultaneously attending college as an Army ROTC cadet.  *Id.* In 2006, he graduated from the University of Notre Dame and commissioned as a Second Lieutenant. *Id.* Between 2006 and 2007, he attended the Army's Infantry Basic Officer Leader's Course at Fort Benning, Georgia.  *Id.*

In 2007,  he joined a field artillery unit with the Michigan Army National Guard and served in a part-time status as a platoon leader and company executive

officer while he attended law school.  *Id.*

From 2010 through 2011, he deployed to Kuwait and Iraq in support of Operation New Dawn as a convoy security platoon leader. He and his men successfully protected hundreds of convoys of American troops and supplies in both countries.  *Id.*

In 2013, he joined the US Army Reserves and became a Warrant Officer.  *Id.* In late 2013 through late 2014, he attended the US Army Flight School at Fort Rucker, Alabama.  *Id.*  In October 2014, he earned the wings of an Army Aviator and qualified to fly the UH-60L Blackhawk helicopter.  *Id.* He graduated as Distinguished Honor Graduate and top of his UH-60L class. *Id.*

From 2014-2018, he returned and served in a part-time status as an Army Aviator and UH-60L Blackhawk pilot with the US Army Reserve unit in Conroe, Texas.  *Id.*

In 2018 through 2019,  he deployed as an individual mobilization augmentee to Afghanistan in support of Operation Freedom Sentinel. *Id.*   He took an assignment as an MI-17 pilot and advisor to the Afghan Special Mission Wing. *Id.*  The Afghan Special Mission Wing was an aviation unit assigned to transport Afghan, US, and NATO special operations commandos to conduct national-level counterterrorist and counternarcotics missions in Afghanistan. *Id.* He earned the qualification to fly the US purchased versions of the Russian MI-17 transport

helicopter while in Afghanistan. *Id.*  During his last five months of my deployment, he served in liaison position briefing the two-star general who commanded NATO special operations component command for Afghanistan. *Id.* During his time in Afghanistan, he assisted with the planning and preparation for dozens of successful counterterrorist and counternarcotics missions and I earned an excellent evaluation. *Id.*

When he returned to the United States in late 2019, he retrained on the UH-60L Black Hawk helicopter and earned the position of pilot-in-command in early 2021. In 2024, he completed the course to train others to become an Aviation Mission Survivability Officer. *Id.* An Aviation Mission Survivability Officer is a senior Army pilot who is responsible for conducting the in-depth planning and intelligence analysis necessary to fly against enemy air defense systems. *Id.*  He also conducts the risk analysis necessary for an aviation command to decide whether or not to commit millions of dollars equipment and dozens of lives to fly any particular mission against a major enemy threat. *Id.*

In April 2013, Plaintiff was hired by the Defendant and worked as an assistant county attorney in the Harris County Attorney's Office.  *Id.*

Year after year, Plaintiff received positive and favorable performance reviews from the Harris County Attorney's Office.  *Exhibits 10, 11, 12 and 13.*

### First Contact with Supervisors Regarding the Disability

In April 2021, Plaintiff, who was experiencing anxiety and mental health issues, notified his supervisors Seth Hopkins ("Hopkins") and Stan Clark ("Clark"), in detail, that he was having trouble concentrating, thinking and moving slowly with his work. *Exhibit 3, page 17, lines 1-20.* He told them he was going through a divorce where his wife just left for London. *Id.* He told them he was struggling with anxiety and depression which was making him struggle with work. *Id.* He asked them what they do if they need help concentrating and thinking. *Id.* He told them he had seen therapists. *Id. at page 19, lines 1-12.*

He said they both acted like they would be supportive and helpful and Clark shared a personal story about his life. *Id. at page 18, lines 2-24.* Plaintiff did not ask for nor use the words reasonable accommodation in that conversation. *Id. at page 20, lines 5-9.*

**Clark Decides to Force a Mental Breakthrough by Assigning 40 New Cases**

Clark then assigned around 40 new Civil Service cases to Plaintiff in the summer of 2021. *Exhibit 16, at bates HC 647 and Exhibit 3, page 158, line 23 – page 160, line 15.* These additional cases were all contested administrative hearings that were like trials and just made the Plaintiff's job more difficult and stressful. *Id.* Later, in Plaintiff's April 2022 performance review, Clark explained the reasoning behind the decision to assigning those cases as he did it so that Plaintiff would be forced to mentally break through being stuck. *Exhibit 16, at bates HC 649 and*

*Exhibit 3, page 118, line 2 – page 119, line 16.*

In November 2021, Plaintiff again explained to Hopkins about the difficulties he was having with stress and anxiety and how it was affecting his work and personal life and he mentioned he was overwhelmed with the Civil Service cases Clark had assigned to him.  *Exhibit 3, page 22, line 23 – page 23, line 9 and page 24, line 18-22 and page 26, line 11 – page 27, line 2.*

Neither Clark nor Hopkins recommended Plaintiff make any formal request or encourage him to file paperwork with Harris County, but if they had he would have.  *Exhibit 3, page 27, lines 3-13.*

Plaintiff identified the issues causing the anxiety to be (1) his wife leaving his young child and him and moving away to a foreign country, (2) the United States' military withdrawal from Afghanistan and former Afghanis he worked with while deployed in Afghanistan begging for help to get their families and themselves out of Afghanistan and being helpless to help them, (3) having too many cases being overburdened/assigned to him at work, (4) being grounded from flying, and (5) having his job stability threatened.  *Exhibit 16 and Exhibit 3, page 77, line 22 – page 78, line 13 and page 218, line 20 – page 221, line 4*

### First Formal Request for ADA and FMLA Relief

On December 8, 2021, Plaintiff sent an email to Hopkins, Clark and Laura Hedge ("Hedge") (Hedge is another supervisor of Plaintiff's) notifying them of his

disability and formal request for accommodation:

> Seth, Stan, and Laura,
>
> Thank you for your help.
>
> I am requesting to start the process of ADA or FMLA accommodation.
>
> I am having great trouble concentrating due to a tremendous amount of personal stress. It is really impairing my ability to get my tasks done in a timely manner.
>
> I can do work. I had four civil service hearings and a civil service motion to dismiss set for today. Two of the cases were either cancelled or continued. I obtained favorable results for the Sheriff's Office on the other three. The motion to dismiss was granted and the commission upheld the two terminations.
>
> I am having enough mental and emotional trouble that I feel the need to ask for help.
>
> This is really hard for me to ask for. I have been doing my best to work through this on my own. Without going into too much detail, i have done counseling and therapy. I have also been taking medication. The Army has temporarily taken me off of flight status due to this.
>
> I do not know what help I need. I do request that we start the flexible, interactive process to discuss this.
>
> Thank you again.
>
> Patrick

*Exhibit 17.* In response, Hopkins recommended to Plaintiff that he submit his request to Jamie Buchanan ("Buchanan") who was a Human Resources ("HR") generalist assigned to the Harris County Attorney's Office and Plaintiff did so on December 10, 2021. *Exhibits 19 and 23.* Hopkins (who is a pilot) also acknowledged that he knew when Plaintiff (a helicopter pilot) was grounded that indicated something was going on. *Id. at page 51, line 14 – page 52, line 5.* Plaintiff sent an email to Buchanan advising her that he was requesting to start the process of ADA or FMLA accommodation, was having great trouble concentrating due to

17

tremendous personal stress, it was impairing his ability to get his tasks done in a timely work, that he can work and had won cases just that week, he was looking for an accommodation, and wanted to start the flexible, interactive process. *Exhibit 23*.

On December 13, 2021, Buchanan asked Plaintiff if he had any idea what type of accommodation he was seeking and Plaintiff responded that he wanted to discuss with his managers and medical providers, but would seek an "accommodation about the particular type of work I am doing."  *Id.*

In December 2021, Hopkins, Clark and Buchanan were discussing Plaintiff's request in their own separate email chain. *Exhibit 22.*  Hopkins had extensive ADA accommodations' request experience by virtue of having handled the largest and longest running ADA claim the state of Louisiana had ever had.  *Exhibit 4, page 6, line 23 – page 7, line 12 and page 20, line 22 – page 21, line 9.*  These email discussions are very telling as follows:

First, on December 16, 2021, Buchanan tells Hopkins and Clark that she is "unsure what accommodation Patrick is requesting and don't want to assume a disability," but she asks them to find out what he has to say and to follow-up with her as to provide an ADA accommodation form to assist with the interactive process. *Exhibit 22, HC 815-816.*  Thereafter, Hopkins replies, "We can meet with him and discuss accommodations.  What forms or other documentation do we need from your end?  What are the steps in the process?" *Id. at HC 815.*

**Harris County Halts the Interactive Process**

The next day Buchanan essentially stops Hopkins and Clark from reaching out to Plaintiff when she writes, "My understanding is that Patrick is maybe going to reach out to you to discuss his work. We have very little information from him at this time regarding his request to begin the interactive process. I am waiting to receive his FMLA paperwork and can update you when I know more. In the meantime, you can wait to see if Patrick reaches out to you or you can send him an email with something along the lines of 'Hi Patrick, We're just checking in with you. Let us know if you have any questions about your work or if we can assist you in any way.' Something like that. If/when he reaches out to you, please just follow up with me … and we can discuss how to best move forward." *Id. at HC 814-815.*

Hopkins testified that he was instructed by Natalie DeLuca that his role was done for the time being after turned over to Buchanan. *Exhibit 4, page 52, line 22 – page 53, line 16.* Hopkins further stated in December 2021, his understanding was he was not to do anything regarding Plaintiff's FML or ADA accommodations requests and in January 2022, he was told not to be involved. *Exhibit 4, page 106, line 1 – page 107, line 5.* By February, Plaintiff was no longer under Hopkins' purview. *Id.* Hopkins never engaged in an interactive process with Plaintiff after being told to stand down.

Clark testified that he never engaged in an interactive process with Plaintiff.

*Exhibit 6, page 110, lines 10-19; page 121, lines 8-23; and page 122, lines 3-7.*

Buchanan could not identify anyone – not herself, Hopkins, Clark, DeLuca or Hedge who sat down and discussed the matter and accommodations with Plaintiff. *Exhibit 5, page 35, lines 2-22.* Buchanan was also aware of the Harris County Interactive Process form that documents what is discussed between a supervisor and an employee who is seeking an accommodation, what accommodations were discussed, what accommodations are agreed upon or not agreed upon, and has a place for both the supervisor and the employee to sign. *Id. at page 43, line 1 – page 45, line 17.* Buchanan said this form was not completed for Plaintiff and if it had been done, then she would have been aware of it. *Id.*

### Harris County's Conduct Violated Its own Policies & Procedures

Defendant's policies and procedures regarding ADA states in relevant part, at Section 5:

## SECTION 5. AMERICANS WITH DISABILITIES ACT

**5.01**  Harris County does not discriminate against employees with disabilities and is committed to complying with all applicable provisions of the Americans with Disabilities Act (ADA). We will provide reasonable accommodations to qualified applicants or employees with disabilities who have made the Department aware of their disabilities, provided that such accommodation does not constitute an undue hardship on the operation of the department. If you need a reasonable accommodation, talk to your supervisor. Departments will engage in an interactive process with you to identify possible accommodations, if any, to help you do your job.

*Exhibit 1 at HC 314.* As shown above, everyone from Plaintiff's supervisors to the

HR generalist Buchanan chose not to engage in an interactive process with Plaintiff to identify possible accommodations, if any, despite a clear policy and procedure that is mandated be done. *Id.*

As shown above, at least at one point, Hopkins and Buchanan had the initial correct idea to sit down and discuss the matter with Plaintiff, but that stopped. The question then becomes why? Enter Natalie DeLuca ("DeLuca"). In December 2021, DeLuca held the title of Special Counsel. *Exhibit 7, page 36, lines 11-22.* Hedge, on December 16, 2021, suggested to Hopkins and Clark that they should defer heavily to DeLuca as to whether Plaintiff has a disability. *Exhibit 21 at HC 2714.* December 16, 2021, is the same day that Buchanan told Hopkins and Clark not to meet with Plaintiff. *Exhibit 22 at HC 814-815.* DeLuca refused to answer questions regarding what she instructed Buchanan to do or not to do based on attorney-client privilege. *Exhibit 7, page 75, lines 9-24.* DeLuca later became Plaintiff's supervisor, taking over Hopkins' position, in February 2022. *Id. at 36, lines 11-22 and page 37, lines 12-17.*

Sometime in mid-December, 2021, Buchanan sent Plaintiff Family Medical and Leave Act ("FMLA") forms to be completed and returned as they are referenced in a December 30, 2021, email to Plaintiff. *Exhibit 25.* These FMLA forms came from the Harris County Auditors Office. *Exhibit 5, page 18, lines 18-23.*

On December 30, 2021, Buchanan sent Plaintiff what she called ADA forms

to be completed by Plaintiff and his doctor. *Exhibit 25.* These forms did not come from the Harris County Auditors Office which does not have ADA forms. *Exhibit 5, page 20, lines 14-25.* These forms are not referenced in the Defendants' Policies and Procedures Manual. *Exhibit 1, Section 5 at HC 314.* The Medical Certification form included does not reference that it is an ADA form anywhere in its title. *Exhibit 25 at 728.* Buchanan testified that she did not create the Medical Certification form, could not recall where the Medical Certification form came from and that she was not aware of it having been used before. *Exhibit 5, pae 20, lines 14-25.*

### Plaintiff Sees Dr. Zdilar for First Time

Plaintiff first saw psychiatrist, Darko Zdilar, M.D. on December 22, 2021, and informed Buchanan of this when she sent the ADA paperwork on December 30, 2021. *Exhibit 20 at HC 223.* Plaintiff advised that the next available appointment he could get was January 21, 2022, and would discuss the paperwork with the doctor at that time. *Id.*

### Buchanan Arbitrarily Denies the ADA Request

On January 24, 2022, Buchanan sent Plaintiff an email that his request for accommodations under the ADA was being denied because his doctor had not returned the Medical Certification. *Exhibit 28.* Buchanan stated the decision would be reconsidered if the form was returned by Plaintiff's doctor. *Id.* Plaintiff advised

that the doctor said would get the paperwork back soon and he would let her know when he got it. *Id.*

### Plaintiff Seeks FMLA Since No Interactive Process

After having no one engage in the interactive process with Plaintiff to discuss accommodations and the anxiety rising, Plaintiff requested the only option he had of FMLA leave for February 28, to March 11, 2022 which was approved. *Exhibit 35.* This leave was approved based on Dr. Zdilar returning all of the paperwork, including the Medical Certification/ADA paperwork on February 25, 2022. *Exhibit 34.*

Plaintiff had tried to discuss with Dr. Zdilar whether he could make a recommendation for a reasonable accommodation after laying out what I do as an attorney. *Exhibit 3, Page 172, line 16 to page 173, line 6.* Plaintiff was left with the impression that Dr. Zdilar did not want to make a recommendation on attorney work that he was not familiar with or what Plaintiff should and should not be working on. *Id.*

### No Question that Plaintiff is Suffering from a Disability - Dr. Zdilar Response

Dr. Zdilar diagnosed Plaintiff in his initial assessment on December 22, 2021, with generalized anxiety disorder and adjustment disorder, unspecified and observed that he was experiencing stress dut to his family/personal life, work life and military service. *Exhibit 33.*

Sometime in January or February in 2022, Dr. Zdilar recalls receiving paperwork from Plaintiff's employer, Defendant Harris County, regarding his need for medical leave. Dr. Zdilar is generally familiar with the forms employers require as necessary for leave under the FMLA. *Id.* Dr. Zdilar noted that Harris County submitted forms for him to complete regarding Plaintiff's current conditions and needs related to his employment. *Id.* One of the forms was identified as Family And Medical Leave Certification of Health Care Provider For Employee's Serious Health Condition and another form was entitled "MEDICAL CERTIFICATION" and noted it was "To Be Completed by Healthcare Provider" and returned within 15 days by mail, email or fax to Buchanan. Dr. Zdilar assumed that both forms were submitted to him related to FMLA consideration. *Id.*

Dr. Zdilar completed the documents that were sent to him and returned them via fax on February 25, 2022, referencing "FMLA paperwork" on the fax cover sheet. *Id. and Exhibit 34.* Dr. Zdilar had also sent a letter the prior day indicating that Plaintiff needed leave under the FMLA and he would be sending the FMLA paperwork the following day. *Id.* Dr. Zdilar did not mention the ADA because he did not realize he was being asked about the ADA. *Exhibit 33.* To the best of Dr. Zdilar's knowledge, he also never received anything from Defendant asking specifically about doing an ADA assessment in addition to the FMLA information he had provided. *Id.*

Dr. Zdilar, in no way, understood that he was the decision maker in regard to any decisions to be made regarding accommodations to be provided under the ADA. *Id.* Rather, he believed that he was completing FMLA paperwork as described above. *Id.* Given that practicing law is a profession like practicing medicine with its own rules and ethical considerations, Dr. Zdilar was not then and is not now in a position to advise an attorney/patient/employee and his employer as to specific accommodations under the ADA that the attorney/employee needs or that are available regarding the practice of law. *Id.* This is something that should have been discussed and handled between Plaintiff and Defendant, both of whom were in the best position to determine appropriate accommodations. *Id.* Dr. Zdilar is simply not knowledgeable enough in practicing law or the type of law Plaintiff practiced to have provided information beyond the need for leave under the FMLA. *Id.*

Dr. Zdilar did provide significant information regarding Plaintiff's condition, that his progress was treatment dependent, and certainly enough information to merit a discussion and interactive process between Plaintiff and Defendant regarding appropriate ADA accommodations. *Id.*

Dr. Zdilar again completed FMLA paperwork for Plaintiff and Defendant in May 2022, wherein enough information regarding Plaintiff's condition again was provided to have merited a discussion and interactive process between Plaintiff and Defendant regarding appropriate ADA accommodations. *Id.*

Specifically, the information provided showed that Plaintiff had a disability, that it impaired his daily life activities, that recovery was treatment driven, and that Plaintiff needed an accommodation. *Exhibit 34.* Despite the information having been provided, as detailed above, no one at any time engaged in the interactive process with Plaintiff.

### Plaintiff Provided All Required Information to Harris County

Despite all forms, including the Medical Certification form, having been completed and provided by Dr. Zdilar to Defendant in February 2024, DeLuca mistakenly reported in the Defendant's Position Statement she prepared and submitted to the Equal Employment Opportunity Commission ("EEOC") that Plaintiff never submitted the requested ADA documentation:

> As of January 24, 2022, Nagorski had still not returned the ADA certification. Accordingly, Nagorski's accommodation request was denied until such time as the requested documentation was provided ("This email is to inform you that your request for accommodation has been denied for failure to return the requested medical documentation. However, if you are able to complete the paperwork in the future we would be happy to reconsider."). Exhibit D. **To this date, Nagorski has never submitted the requested ADA documentation.**

*Exhibit 47.*

DeLuca's statement that Plaintiff never submitted the requested ADA documentation, i.e. the Medical Certification is not true as Buchanan testified. *Exhibit 5, page 58, lines 10-15 and page 60, lines 1-4.* As recently as her July 18, 2024 deposition, DeLuca continues to assert that she does not even know if Plaintiff

had mental health conditons because she alleges Plaintiff never provided any medical documentation. *Exhibit 7 , page 107, line 13 to page 108, line 14.* As shown throughout this facts section, Dr. Zdilar did indeed send the medical documentation. *Exhibits 33 and 34.* Someone apparently provided this same incorrect information to Hopkins because he testified in his deposition that he felt there was no need for an interactive process because he also believed Plaintiff didn't follow through with his obligation to provide preliminary information. *Exhibit 4, page 147, line 22 to page 149, line 11.*

### FMLA Leave #1

On February 28, 2022, through March 12, 2022, Plaintiff went on FMLA approved leave, followed by required military leave. *Exhibit 35.* Prior to going on that leave, Plaintiff had been assigned a very labor-intensive email review and redaction project for the Russell Bail Bond matter that had been assigned to two other attorneys working jointly on the project which he successfully completed as only one attorney prior to taking his protected FMLA leave. *Exhibits 31 and 32.* Plaintiff received praise from Clark and Hopkins who told him he had done more than an attorney had done in six months of having the project. *Exhibit 32.*

In February 2022, Hopkins was transferred to a different position and DeLuca took on Hopkins' role. *Exhibit 4, page 35, lines 14-19.* Upon taking over Hopkins' position, DeLuca testified that she did not need to be apprised of Plaintiff's situation

by anyone because she was already familiar with the situation by virtue of having provided legal advice to Defendant regarding Plaintiff's request for an interactive process to discuss ADA accommodations (and his request in general) in December 2021.  *Exhibit 7, page 93, lines 11-22.*

Before Plaintiff left for his protected FMLA leave followed by protected military leave in February/March 2022, Clark involved one of Plaintiff's co-workers, another assistant county attorney named Pam Rea, to do a cursory look at Plaintiff's files to determine what may need to be handled while he was out on leave and to discuss them with Plaintiff.  *Exhibit 8, page 128, line 21 to page 129, line 4 and page 130, line 18 to page 133, line 1.*  Rea is considered an excellent litigator, who is ethical, of high intregity, and honest.  *Id at page 84, line 6 – page 85, line 20.*

### Clark's Derogatory Comments and Nitpicking Crusade

Rea testified that she had always had a good impression of Plaintiff.  *Id. at page 88, line 3 to page 89, line 21.*  This impression changed for the worse after Clark began to tell her that upper leadership and he thought Plaintiff was lazy and was not doing his work.  *Id. at page 90, line 22 to page 92, line 8 and 92, line 18 to page 93, line 3.*  Clark told Rea that Plaintiff was "claiming" to have mental health issues.  *Id. at page 93, lines 4-21.*  Clark told Rea that Plaintiff's medical leave was for mental health leave and she did not believe she should have been told this private

information which made her very uncomfortable.  *Id. at page 123, line 20 to page 124, line 19 and page 126, line 19 to page 127, line 23.*

Clark made other derogatory comments to Rea about Plaintiff like:

- No wonder he hadn't advanced further at the County because had taken off a year to go play soldier in the Middle East;

- Told her he had meetings with the Administration about Patrick and don't know what we're going to do about him;

- Called him "Poor Patrick;"

- No wonder his wife left him after serving in the Middle East for a year; and

- **That "they" wanted Patrick gone.**

*Id. at page 135, line 12 to page 137, line 6; page 143, line 22 to page 144, line 14; page 151, line 24 to page 152, line 13; and Exhibit 9.*  She also had the distinct impression that Clark was holding Plaintiff's military service leave against him. *Exhibit 8, page 145, lines 17-23.*  Rea did not believe saying "playing soldier" was an appropriate way to describe the work of our reservists or our military.  *Id. at page 139, line 14 to page 140, line 15.*

Rea did not report Clark's inappropriate remarks about Plaintiff at the time because she had good reason to believe she would be punished or it would make her a target.  *Id., page 199, line 14 to pae 201, line 22.*

### The Deeper Dive

Rea did not find any "raging" problem with Plaintiff's work when she reviewed his files to determine what needed to be done while he was on leave.  *Id. at page 147, line 10 to page 148, line 22.*  Rea said Clark then came back to her and told her that DeLuca wanted her to conduct further evaluations of Plaintiff's cases more critically.  *Id. at page 148, line 23 to page 150, line 2.*  Rea had never been asked to evaluate or nitpick any other assistant county attorney's cases other than Plaintiff's.  *Id.*  While it was happening, she also did not recognize the bias against Plaintiff that she had developed from what Clark had been telling her.  *Id.*

Rea never felt that Clark was making up having meetings with the people who were saying they wanted to get rid of Plaintiff.  *Id. at page 141, line 22 to page 142, line 23.*

Clark, while he initially tried to deny making certain negative statements about Harris County or conditions at Harris County, had to admit they were true when confronted with his text messages with Rea.  *Exhibit 69.*  For example, he:

- Described the office environment as "it's got real messy and weird;"

- Said "anyone with self-respect and options is going to leave once they feel the tide turn against them;"

- Pushed a paralegal to find other County work before being subjected to indignity and could leave on her own terms;

- **Felt that once DeLuca got you in her crosshairs that it was pretty much over for you and you ought to be looking for another job;**

- Felt the CAO (County Attorney's Office) views atorneys and staff as fungible/replaceable;

- **Felt DeLuca was overly punitive with attorneys; and**

- **There were concerns with how DeLuca handled things.**

*Id. and Exhibit 6, page 154, line 21 to page 155, line 7; page 157, line 23 to page 158, line 5; page 158, lines 11-24; page 152, line 14 to page 153, line 1; page 158, line 25 to page 159, line 16; page 159, line 25 to page 160, line 4.*

To try to counter her part in working with Clark, Rea recounted that after Plaintiff returned from his second leave that she had told everyone that she was struggling to get a motion for summary judgment completed during a Teams Meeting. *Exhibit 9, page 3.* As soon as the meeting was over, her phone rang and it was Plaintiff calling to offer his help. *Id.* He offered to do the legal research and write the legal part leaving her to fill in the facts. *Id.* She said he got it done in one day, did a very good job with it, and the motion ultimately prevailed. *Id.* Rea did let Clark know what a good job Plaintiff had done. *Id.*

### Pretext/The Review

Shortly after returning from the February/March 2022 protected FMLA and military leave, Plaintiff was given a very negative, highly critical performance

review (authored by Clark and Hopkins) which basically attacked him for the very things he had reported he was having difficulty with and for which he had sought accommodations. *Exhibit 14.* However, it was a pretext to get rid of the Plaintiff as is shown by the testimony of Rea, and the other evidence herein. *Exhibit 8, page 141, line 22 to page 142, line 23.* For example:

It was represented as a 2021-2022 review, but referred to 2020 case activities. *Exhibit 14.*

In the Casares case example given in the review, Plaintiff was accused of not filing a Plea to the Jurisdiction timely back in 2020 (even though there is no deadline for a Plea to the Jurisdiction) and for which Plaintiff had concerns if would work given the facts of the case. *Id.* Clark, who criticized Plaintiff for not filing a Plea to the Jurisdiction in the review, sent an email regarding the issue to Plaintiff on October 19, 2021, stating "We have plenty of work as it is and I think a pttj [Plea to the Jurisdiction] may be difficult here or at the CoA." *Exhibit 62 at HC 1233.* Further, after Plaintiff was constructively discharged from the County Attorney's Office, no other attorney from the office filed a Plea to the Jurisdiction in the case nor did anyone else from the County Attorney's Office substitute in for him. *Exhibit 61.*

In the Rollins case example given in the review, Plaintiff was accused of being "rebuked" by a federal judge in 2020. *Exhibit 14.* Plaintiff was not rebuked. *Exhibit*

*58.*  In Rollins, a vexatious litigant who sued all the Harris County Judges (and has sued the President of the United States, all the Harris County JP judges and so on) filed a motion for sanctions against Harris County and Plaintiff because when Plaintiff substituted into the case, he emailed a copy of the filing to Rollins who then filed a motion for sanctions because he wanted to only be served by mail. *Id.* Plaintiff admittedly did miss the deadline to respond in 21 days and the Court issued a two to three sentence reminder order that a response had not been filed and ordered a response to be filed. *Id.*  The response was filed right away and before the deadline. *Id.* It was in no way a rebuke.  *Id.*

The motion for sanctions was denied and the case was dismissed.  *Id.*  In the review, it appears that Clark and Hopkins were trying to suggest that after being "rebuked" that the case was only dismissed because another attorney took over and filed a motion. *Exhibit 14.*  The reality is that Plaintiff was assigned the case after another attorney in the office had already filed the motion to dismiss before Plaintiff took over so it had just been pending and awaiting a ruling. *Id., Exhibits 16 and 58.*

Indeed, the Rollins dismissal was celebrated in emails between Plaintiff, Rea, Clark and Hopkins in August 2021. *Exhibit 59.*  The dismissal was going to help out Rea who was defending another federal case filed by Rollins against all the JPs in Harris County. *Id.*

With Rollins, Plaintiff was handling the appeal in the Fifth Circuit. *Exhibit 16.* It was his first appellate case in the Fifth Circuit. *Exhibit 16.* He did not have five prior appeals in the Fifth Circuit as incorrectly stated in the review. *Exhibits 14 and 16.* Plaintiff did not realize that the Fifth Circuit did not work like state appellate courts and that an attorney has to be admitted. *Exhibit 16.* Plaintiff had written the draft of the brief, but needed the record to complete it, but it is not as if he had done nothing. *Exhibit 60.* Plaintiff also asked for Clark to get the record since he was admitted and Plaintiff would finish writing it/filling in the record cites to be filed under Clark's name, but Clark refused. *Exhibit 16.*

Finally, in the Patel appeal, Plaintiff had volunteered to take the appeal after Hopkins offered it to three attorneys on March 18, 2021. *Exhibit 51.* When Plaintiff accepted the case, he had to immediately file for an extension because the brief was due in a few days. *Exhibit 57.* Plaintiff did request two more extensions which were both granted. *Id.* The appellant's attorney had received six extensions in the case. *Id.* Plaintiff was in regular contact with Hopkins regarding the brief and would provide him drafts for review and comment. *Exhibits 53, 54, 55, and 56.* Nowhere in any of those emails does Hopkins criticize Plaintiff for requesting the third extension. *Id.* However, in the review a year or so later, Plaintiff's conduct is described as "an unheard of" three extensions. *Exhibit 14.*

Clark and Hopkins began writing and exchanging multiple drafts of Plaintiff's review around December 22, 2021, to around, at least January 26, 2022, but never really added much to it.  *Exhibits 24, 26, 27, and 30.*

Even after the nitpicking that Rea was tasked with doing on Plaintiff's files while he was out on protected leave, these were the best examples that Clark and Hopkins apparently could come up with to attack Plaintiff in the review to set the plan in motion to get rid of Plaintiff.  For this, the review states, "Patrick will be placed on a performance improvement plan that will contain specific conditions **he is required to meet to remain employed** at the Harris County Attorney's Office." *Id.* **emphasis added**.  The review is completely silent as to having the interactive process he requested in December or any acknowledgement of the issues he had raised and requested help with.  *Id.*

### More Pretext/The Performance Improvement Plan

At this point, the reader should expect to see the performance improvement plan that was given to the Plaintiff, but alas there never was one prepared or given to him.  DeLuca admitted that he was never given the performance improvement plan and that it had been Clark's job to write it for her review and she never got it. *Exhibit 7, page 96, lines 18 – 25; page 100, lines 3-22 and page 101, lines 12-15.* Clark testified that he and DeLuca would have been the ones who drafted it, but he

had never issued one before. *Exhibit 6, page 168, lines 1-5 and page 174, lines 7-13.*

Clark testified that DeLuca had him create files on attorneys in addition to their regular personnel files with the conversation being in terms of subsequent remedial measures to support termination. *Id. at page 175, line 9 to page 176, line 15.* Please recall, as cited above, that Clark is the one who testified that he felt once DeLuca got you in her crosshairs that it was pretty much over for you and you ought to be looking for another job, that DeLuca was overly punitive with attorneys, and there were concerns with how DeLuca handled things.

In discovery, Defendant produced a Performance Improvement Plan of one of Plaintiff's co-workers

**Plaintiff Again Seeks Accommodations**

**and to Engage in the Interactive Process and is Ignored Yet Again**

After the devastating review, Plaintiff went in to talk to DeLuca to discuss the review, discuss whatever the performance improvement plan would be, and discuss the accommodations and interactive process he did not receive, but the meeting was cut short by DeLuca to attend to someone else. *Exhibit 3, page 67, lines 11-24 and page 113, line 16 to page 114, line 13.* DeLuca admits this meeting occurred, but doesn't think anything he said about the interactive process or accommodations required her looking further into it because he did not complete any of the requested

documentation. *Exhibit 7, page 93, line 23 to page 94, line 17.* However, as shone above by the testimony of Buchanan in HR, Dr. Zdilar and the fact that Defendant produced the records, this simply was not true.

After the performance review, Clark was pushing Plaintiff to sign the review in a multi-party email chain and Plaintiff once again brought up, on his May 3, 2022, email that he had asked for accommodations and an interactive process that didn't happen. *Exhibit 45 at HC 847.* Specifically, Plaintiff wrote to DeLuca, Clark, Hopkins, Fombonne and Hedge, "I have some real problems with this review. It is the only negative review I have had at the CAO. Months ago, I asked to start the ADA reasonable accommodation interactive process for the difficulites I was having with thinking and working due to mental health problems. I used specific language when making the request. No one worked with me on this. I am going to find out what I need to know to proceed properly. Thank you for your attention." *Id.*

Not one of these, his managers, even acknowledged that he raised the issue again. *Id.* Clark did respond and said, "Thank you Patrick. Can you add these comments to your review, sign and return please?" *Id.* DeLuca testified that she didn't see his visit to her office or this email as a request for the interactive process to discuss accommodations. *Exhibit 7, page 95, line 3 to page 96, line 17.* DeLuca perceived Plaintiff's May 3, 2022, email and visit as explaining his poor performance review and citing to the ADA process as the reason. *Id.*

### Plaintiff Sees the Writing on the Wall

At this point, Plaintiff saw and felt what was coming and believed that he was being forced out.  *Exhibit 3, page 122, line 3 to page 124, line 11 (*irritated with Plaintiff for taking FMLA leave – "all the scrutiny started after I had initially told them about my problems in April of 2021"); *Page 129, lines 2-17 (*when reviewed a sample performance improvement plan, was clear "going to be set up for failure and termination"); *Page 132, line 17 to page 133, line 6* (believed at the time was intentionally being forced out or would be terminated and then have a black mark against him); *Page 133, lines 7-14; Page 133, line 25 to Page 139, line 23; Page 140, line 16 to page 141, line 13; Page 143, line 24 to page 145, line 1; Page 145, line 20 to page 155, line 2*   (details all the actions taken by supervisors to form reasonable basis why believed being forced out:  (1) being admonished by Hopkins for requesting an extension in Patel when never admonished before when it happened, (2) Clark giving me 40 plus civil service cases in the summer of 2021 where each one is like a trial to force me to mentally breakthrough knowing that Plaintiff was over-worked and burdened, (3) for Clark angrily taking the Rollins appeal from me when I still could have completed the brief that was pretty much done but for record cites, (4) Hopkins getting angry with me in November over something minor and then we set a meeting to discuss but was canceled because of

38

COVID – then never rescheduling with me, (5) called Clark (corrected from Hopkins to Clark in Errata sheet) in December of 2021 to request a reasonable accommodation and start the interactive process and Plaintiff had suggested not being put on cases with heavy discovery – he never got back to me, (6) Buchanan denying the reasonable accommodation request but I attribute to my supervisors, (7) the Harris County policy requires a manager to engage in the interactive process with no requirement for medical certification, (8) working on a federal civil rights case with Jennifer Callen since 2021 when removed by Clark without explanation one day – I had worked on it extensively – these are the types of cases that progress your career in the Harris County Attorney's Office (see also *Exhibit 29 – email removing Plaintiff from the case)*, and (9) feeling very betrayed by Hopkins and Clark for trusting them and then they write a review that could cost him his job after he had opened up about something so personal, acknowledged that he needed some help, and had even saved Clark back in 2020 when he missed a deadline and had a default judgment entered against Constable Rosen as a result in an F-5 case, but Plaintiff got it reversed for him.

After the job-threatening review, again being rejected to engage in any type of interactive process to discuss possible accommodations, and then not being given the performance plan so knew what was expected in order to keep his job, Plaintiff

requested and was approved for his second FMLA leave in May 2022. *Exhibit 43 and 71.* DeLuca gave Buchanan a heads up to look for the paperwork. *Exhibit 42.*

### The Harris County Attorney's Office may be the Gatekeeper, but it Doesn't Follow its Own Policies, Procedures and Training

Part of Plaintiff's frustration is that the Harris County Attorney's Office is who all the Harris County divisions and departments look to in order to handle their employment issues correctly. *Exhibit 7, Page 127, line 2 to page 129, line 10.* DeLuca testified that Harris County is the third largest county in the country and there can be a lot at stake if the County gets sued and loses. *Id.* DeLuca agreed that it is important that the County Attorney's Office conducts itself with integrity, honesty, follows ethical rules and follows laws that protect employees. *Id.* In fact, the Harris County Attorney's Office is who gets contacted when any of the other County divisions or departments have employment, employee-employer issues arise. *Id.* The Harris County Attorney's Office is who gets called by other divisions or departments to to tell them what they can or cannot do in regard to employees and what are their obligations. *Id.* As DeLuca states, "We are the provider of legal counsel." *Id.*

Yet, here we are and Defendant can't follow its own policies and procedures in regard to the ADA to simply have a manager have a meaningful discussion with an employee regarding possible accommodations as its policies and procedures

40

instruct it to. *Exhibits 1 and 2, Section 5 therein.* Defendant cannot even follow its own ADA training. *Exhibit 48.* Defendant also produced training materials on the ADA. *Id.* In its training materials, it states in relevant part:

- The ADA <u>prohibits discrimination</u> because of a disability (or a history of a disability), or because someone is perceived as having a disability. *Id. at HC 1930*

- Requires an <u>interactive process</u> with the employee and possibly his/her healthcare provider. *Id. at HC 1930*

- Highly <u>individualized,</u> fact-specific anaylsis (the interactive process). *Id. at HC 1930*

- A "Disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities. *Id. at HC 1931*

- Accommodations may relate to how, when or where a job is performed. *Id. at HC 1935*

- It relates what the EEOC's own words are, "All I can tell you what we see in [litigation]…the fact of the matter is… The leave ran out, they were gone, that was it. The problem is, I don't think, is whether employers have a generous leave or ungenerous leave; but the concept of an interactive process in this area seems to have gone out the window for many…. And I think that was the problem… that

nobody ever thought it was important to call the employee up on the phone, to sit down with the employee, to respond in any meaningful, substantive way, 'How are we going to deal with this leave problem?'" *Testimony of EEOC Regional Attorney John Hendrickson at 6/8/11 Public Meeting. Id. at HC 1939*

- The training reminds Defendant that "Nothing is off the Table for Discussion," that accommodation requests continue to take new forms, that it may NOT be something you already do, and "maybe the answer is yes, maybe it's no-but we have to go through the interactive process." *Id. at HC 1945*

- The training presentation includes "FMLA/ADA Mistakes We Are Still Seeing Every Day;" e.g., "The employee didn't actually ask for an accommodation." "Not talking to the employee." "Over-aggressively investigating employees receiving accommodations." "ADA confidentiality issues." *Id. at HC 1967-1968*

- The training concludes with what to do now and an admonition to "Watch for cues that medical issues are in play and respond properly—the burden is ours."

**Plaintiff Takes Second FMLA Leave and Leaves the Harris County Attorney's Office**

At the end of the day, Plaintiff took his second leave in the Summer of 2022, filed his EEOC charge, and found another job because he was constructively discharged and being run out of a job. *Exhibit 71.*

Plaintiff's Exit Interview is not evidence that demonstrates Plaintiff did not believe he was discriminated against as Defendant suggests. *Exhibit 65 (Def. Ex. 14).* Plaintiff's testimony was that he did not mention believed he was being discriminated against in the Exit Interview is because he was talking to an HR employee that he didn't want to know his personal business and he had already hired an attorney who filed his EEOC complaint. *Exhibit 3, Page 206, lines 3-23.* He further stated that he did not want to discuss it with HR or his managers. *Id.* In reviewing the Exit Interview, the HR interviewer did note that "he had a strong feeling he had to leave" which fully supports his belief that he was being pushed out. *Exhibit 65 at HC 868.* She also noted that he "stated he asked for help and said he was overworked and ignored" which also supports the allegations he has made in this lawsuit. *Id. at HC 869.* She also noted that he stated that people with two years more experience than him were making $30,000 more than him. *Id. at HC 870.* Plaintiff would submit that he was referring to Sosa and Gassama cited above who actually had two years less experience than him. *Exhibits 67 and 68.*

### III.  STANDARD OF REVIEW

Summary judgment is only proper "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Initially, the responsibility is upon the moving party to inform the district court of the basis for its motion and to identify the record evidence which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrell*, 477 U.S. 317, 323 (1986). "A fact is material if it might affect the outcome of the suit and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021). "If 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)).

If the movant meets its Rule 56(c) burden to point out an absence of evidence on an essential element of the nonmovant's case, on which the nonmovant bears the burden of proof at trial, "the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021). All reasonable inferences are drawn in the nonmovant's favor. *Loftin v. City of Prentiss*, 33 F.4th 774, 779 (5th Cir. 2022). A nonmovant "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp. Inc.*, 8 F4th 363, 369 (5th Cir. 2021) (quoting references omitted). The burden is on the

nonmovant to identify the specific record evidence and how the evidence aids its case. *Shah v. VHS San Antonio Partners, LLC*, 985 F.3f 450, 453 (5th Cir. 2021). The Court "may not make credibility determinations or weight the evidence" in ruling on a motion for summary judgment and must review all facts in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 1333, 150, 120 S.Ct. 2096, 147 L. Ed. 105 (2000) and *Colony Life Ins. Co. v. Sanford*, 555 F.3d 777, 181 (5th Cir. 2009).

## IV.  ARGUMENT AND AUTHORITIES

**A.**  **Plaintiff more than meets his burden to establish a prima facie case of disability discrimination under the ADA.**

Plaintiff incorporates the foregoing Key Facts section as if fully set out herein.

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  A plaintiff must show (1) he has a disability or was regarded as disabled, (2) he was qualified for his job, and (3) he was subject to an adverse employment decision on account of his disability. *Dickerson v. VA*, 2023 U.S. Dist. LEXIS 159042*16, 2023 WL 5837503 citing *E.E.O.C. v. LHC Grp., Inc.,* 773 F.3d 688, 697 (5th Cir. 2014).  Once a plaintiff shows a prima facie case , the burden then shifts to the employer to present a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* citing *Campos v. Steves & Son, Inc.*, 10 F.4th 515, 521 (5th Cir. 2021).  If the burden is

met by the employer, then the employee must show that those reasons were pretextual. *Id.*

Defendant does not dispute that Plaintiff has a disability or was regarded as disabled; hence, element one is satisfied and it is established that Plaintiff has a disability or was regarded as disabled.

Plaintiff can more than meet his burdent to establish a prima facie case on all elements.

## 1. Plaintiff more than meets his burden to show that he was a "qualified individual" under the ADA.

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111 (8). To be qualified means "either (1) [the employee] could perform the essential functions of the job in spite of [his] disability," or "(2) that a reasonable accommodation by the employer would enable him to perform the essential functions of the job." *Campos* at 521.

### a. Plaintiff could and did meet deadlines

Plaintiff was and is a qualified individual under the ADA. The argument that Plaintiff could not meet deadlines is a bit of a slippery slope for Defendant. The evidence supporting that Plaintiff is a qualified individual is as follows:

Plaintiff was licensed to practice law in the State of Texas. *Exhibit 71.* Defendant's actions do not support the concept that they did not find Plaintiff qualified to do his job as an assistant county attorney representing the third largest county in the country. It begs the question as to why if Defendant found Plaintiff to be so incapable of meeting deadlines that Defendant continued to assign him new cases and an exceptionally important project in January 2022, a month and a half after Plaintiff notified Defendant that he had a disability and was seeking an interactive process to discuss accommodations. *Exhibits 31 and 32.*

The project was a massive and detail-oriented review and redaction of 7,000 emails in the Russell Bail Bond matter. *Id.* Plaintiff's supervisors assigned the matter to Plaintiff away from two other attorneys who were attempting to tackle the project. *Id.* Arguably, the fact that they trusted him to handle such a labor-intensive project with a very short deadline shows they weren't concerned about his ability to perform.

Perform he did. Plaintiff reported to his supervisors the progress he was making and was congratulated for having done more in a short time than a prior attorney had accomplished in six months. *Exhibit 32.* After Plaintiff designated his FMLA leave to commence in February 2022, Clark told Plaintiff he wanted him to complete the project before going on leave and Plaintiff did so.

During the time period while Plaintiff was still employed by Harris County

with the County Attorney's Office, he continued to work, be assigned new cases, meet deadlines, and have successes in cases. *Exhibit 71 and 32.* At the time he was constructively discharged, he had 44 cases on his docket. *Exhibit 70.*

The allegations around the pattern alleged by Defendant is all pre-text. Shortly after returning from the February/March 2022 protected FMLA and military leave, Plaintiff was given a very negative, highly critical performance review (authored by Clark and Hopkins) which basically attacked him for the very things he had reported he was having difficulty with and for which he had sought accommodations. *Exhibit 14.* However, it was a pretext to get rid of the Plaintiff as is shown by the testimony of Rea, and the other evidence herein. *Exhibit 8, page 141, line 22 to page 142, line 23.* For example:

It was represented as a 2021-2022 review, but referred to 2020 case activities. *Exhibit 14.*

Specifically, in Casares, Plaintiff was accused of failing to timely file a plea to the jurisdiction in 2020 despite a plea to the jurisdiction having no deadline and can be raised any time on appeal. *Id.* Clark who authored and leveled such complaint in the Performance Review sent an email regarding the issue to Plaintiff on October 19, 2021, stating "We have plenty of work as it is and I think a pttj [Plea to the Jurisdiction] may be difficult here or at the CoA." *Exhibit 62 at HC 1233.* Further, after Plaintiff was constructively discharged from the County Attorney's

Office, no other attorney from the office filed a Plea to the Jurisdiction in the case nor did anyone else from the County Attorney's Office substitute in for him. *Exhibit 61*. It obviously was not that important.

In the Rollins case example given in the review, Plaintiff was accused of being "rebuked" by a federal judge in 2020. *Exhibit 14*. Plaintiff was not rebuked. *Exhibit 58*. In Rollins, a vexatious litigant who sued all the Harris County Judges (and has sued the President of the United States, all the Harris County JP judges and so on) filed a motion for sanctions against Harris County and Plaintiff because when Plaintiff substituted into the case, he emailed a copy of the filing to Rollins who then filed a motion for sanctions because he wanted to only be served by mail. *Id.* Plaintiff admittedly did miss the deadline to respond in 21 days back in 2020 and the Court issued a two to three sentence reminder order that a response had not been filed and ordered a response to be filed. *Id.* The response was filed right away and before the deadline. *Id.* It was in no way a rebuke. *Id.*

The motion for sanctions was denied and the case was dismissed. *Id.* In the review, it appears that Clark and Hopkins were trying to suggest that after being "rebuked" that the case was only dismissed because another attorney took over and filed a motion. *Exhibit 14*. The reality is that Plaintiff was assigned the case after another attorney in the office had already filed the motion to dismiss before Plaintiff took over so it had just been pending and awaiting a ruling. *Id., Exhibits 16 and 58*.

Indeed, the Rollins dismissal was celebrated in emails between Plaintiff, Rea, Clark and Hopkins in August 2021. *Exhibit 59.* The dismissal was going to help out Rea who was defending another federal case filed by Rollins against all the JPs in Harris County. *Id.*

Finally, in the Patel appeal, Plaintiff had volunteered to take the appeal after Hopkins offered it to three attorneys on March 18, 2021. *Exhibit 51.* When Plaintiff accepted the case, he had to immediately file for an extension because the brief was due in a few days. *Exhibit 57.* Plaintiff did request two more extensions which were both granted. *Id.* The appellant's attorney had received six extensions in the case. *Id.* Plaintiff was in regular contact with Hopkins regarding the brief and would provide him drafts for review and comment. *Exhibits 53, 54, 55, and 56.* Nowhere in any of those emails does Hopkins criticize Plaintiff for or even mention the third extension. *Id.* However, in the review a year or so later, Plaintiff's conduct is described as "an unheard of" three extensions. *Exhibit 14.*

Yet, Plaintiff continued to work and be assigned new cases. Yet, the Defendant erroneously claims he is not qualified.

**b. Defendant's summary judgment evidence supports that reasonable accommodations existed that would enable Plaintiff to meet his essential job function of meeting deadlines.**

Plaintiff incorporates the foregoing Key Facts section as if fully set out herein.

Assuming and definitely without agreeing that Plaintiff had an issue with deadlines, the claim that no reasonable accommodation existed is false.  Evidence produced by Defendant in this case clearly demonstrates that, in fact, an accommodation could have been provided similar to what was required of A. Van Hoose, a co-worker of Plaintiff's, in her Performance Improvement Plan from 2022. *Exhibit 63.*  Ms. Van Hoose was placed on a Performance Improvement Plan around May 25, 2022 referencing that she had failed to observe that no answer had been filed in a case.  *Id.*  As part of her Performance Improvement Plan, the first requirement states:

"1. "Meet with me every Monday at 9;30 a.m. (except for Monday, May 31, which we will reschedule due to Memorial Day holidays) to discuss status of all cases and lay out required work for the week.  Deadlines will be set for any draft submissions to me for review, filing deadlines with the Court, and other necessary case tasks." *Id.at HC 875-876.*

This action taken by Defendant could very easily been converted into an accommodation that could have been offered to Plaintiff if during the interactive process that should have occurred had actually occurred.  Other accommodations that could have been offered for this specific deadline issue being alleged could have been having a mirror calendar between a supervisor with Plaintiff and send ticklers for upcoming deadlines.  Could have engaged a mentor in the office.  Could have

created earlier deadlines for turning more significant items in with a feedback period. Could have created a back-up system to help if, for example, have 8 administrative hearings as mini-trials in a week. The reality is that there are numerous things that could potentially have been done and that should have been done in an interactive process. The Defendant's own evidence shows that it had the knowledge and the ability to have offered an accommodation similar to the condition placed on Ms. Van Hoose in her Performance Improvement Plan. The Defendant's own training materials advise them to get creative. *Exhibit 48.*

### 2. Plaintiff did receive adverse employment action.

Plaintiff incorporates the foregoing Key Facts section as if fully set out herein.

Defendants completely ignore the Fifth Circuit's recent decision in the *Hamilton* case wherein an adverse employment action need only be a term, condition or privilege of employment. *Hamilton v. Dallas County,* ---F.4th---, 79 F. 4th 494, 2023 U.S. App. LEXIS 21780, 2023 WL 5316716 *5 (5th Cir. Aug. 18, 2023) (en banc). While *Hamilton* is a Title VII case, courts are finding that the "holding leaves no justification for continuing to apply the ultimate-employment-decision requirement to disability discrimination claims." *Dickerson v. VA,* 2023 U.S. Dist. LEXIS 159042, 2023 WL 5837503 *18. Judge Rosenthal reasons "The relevant language in the Americans with Disabilities Act is substantially similar to the Title VII language analyzed in *Hamilton*. Both statutes prohibit discrimination

regarding the 'terms, conditions, and privileges of employment.'" *Id.*

Plaintiff did receive adverse employment action in multiple ways beyond the Performance Review which was a pretext as shown above. Plaintiff was viewed in a negative and false light due to Clark's actions and comments. In January 2022, after making his request, a federal case he was second chair on was taken away from him even though he had performed well on the case. *Exhibit 29*. This was a civil rights case of the kind that helps advance your career and boost your prestige. *Id.*

Plaintiff was subjected to ridicule with his colleagues when Clark shared with Rea that Plaintiff was lazy, was "claiming" a mental health issue, was out on mental health leave, and more importantly he spilled the beans that they wanted Plaintiff out and other derogatory comments to Rea about Plaintiff like:

- No wonder he hadn't advanced further at the County because had taken off a year to go play soldier in the Middle East;

- Told her he had meetings with the Administration about Patrick and don't know what we're going to do about him;

- Called him "Poor Patrick;"

- No wonder his wife left him after serving in the Middle East for a year; and

- That "they" wanted Patrick gone.

*Exhibit 8 at page 135, line 12 to page 137, line 6; page 143, line 22 to page 144, line 14; page 151, line 24 to page 152, line 13; and Exhibit 9.*

Rea said Clark then came back to her and told her that DeLuca wanted her to conduct further evaluations of Plaintiff's cases more critically.  *Id. at page 148, line 23 to page 150, line 2.*  Rea had never been asked to evaluate or nitpick any other assistant county attorney's cases other than Plaintiff's.  *Id.*  While it was happening, she also did not recognize the bias against Plaintiff that she had developed from what Clark had been telling her.  *Id.*

Rea never felt that Clark was making up having meetings with the people who were saying they wanted to get rid of Plaintiff.  *Id. at page 141, line 22 to page 142, line 23.*

Clark, while he initially tried to deny making certain negative statements about Harris County or conditions at Harris County, had to admit they were true when confronted with his text messages with Rea.  *Exhibit 69.*  For example, he:

- Described the office environment as "it's got real messy and weird;"

- Said "anyone with self-respect and options is going to leave once they feel the tide turn against them;"

- Pushed a paralegal to find other County work before being subjected to indignity and could leave on her own terms;

- Felt that once DeLuca got you in her crosshairs that it was pretty much over for you and you ought to be looking for another job;

- Felt the CAO (County Attorney's Office) views attorneys and staff as fungible/replaceable;

- Felt DeLuca was overly punitive with attorneys; and

- There were concerns with how DeLuca handled things.

*Id. and Exhibit 6, page 154, line 21 to page 155, line 7; page 157, line 23 to page 158, line 5; page 158, lines 11-24; page 152, line 14 to page 153, line 1; page 158, line 25 to page 159, line 16; page 159, line 25 to page 160, line 4.*

Plaintiff also has testified that two attorneys who have been licensed two years less than him and have less tenure, Sosa and Gassama, were promoted to Senior County Attorneys above him and each made $30,000 more than him. *Exhibit 65 at 890, 67 and 68.*

At this point, Plaintiff saw and felt what was coming and believed that he was being forced out. *Exhibit 3, page 122, line 3 to page 124, line 11 (*irritated with Plaintiff for taking FMLA leave – "all the scrutiny started after I had initially told them about my problems in April of 2021"); *Page 129, lines 2-17 (*when reviewed a sample performance improvement plan, was clear "going to be set up for failure and termination"); *Page 132, line 17 to page 133, line 6* (believed at the time was intentionally being forced out or would be terminated and then have a black mark

against him); *Page 133, lines 7-14; Page 133, line 25 to Page 139, line 23; Page 140, line 16 to page 141, line 13; Page 143, line 24 to page 145, line 1; Page 145, line 20 to page 155, line 2* (details all the actions taken by supervisors to form reasonable basis why believed being forced out: (1) being admonished by Hopkins for requesting an extension in Patel when never admonished before when it happened, (2) Clark giving me 40 plus civil service cases in the summer of 2021 where each one is like a trial to force me to mentally breakthrough knowing that Plaintiff was over-worked and burdened, (3) for Clark angrily taking the Rollins appeal from me when I still could have completed the brief that was pretty much done but for record cites, (4) Hopkins getting angry with me in November over something minor and then we set a meeting to discuss but was canceled because of COVID – then never rescheduling with me, (5) called Clark (corrected from Hopkins to Clark in Errata sheet) in December of 2021 to request a reasonable accommodation and start the interactive process and Plaintiff had suggested not being put on cases with heavy discovery – he never got back to me, (6) Buchanan denying the reasonable accommodation request but I attribute to my supervisors, (7) the Harris County policy requires a manager to engage in the interactive process with no requirement for medical certification, (8) working on a federal civil rights case with Jennifer Callen since 2021 when removed by Clark without explanation one day – I had worked on it extensively – these are the types of cases that progress your

career in the Harris County Attorney's Office (see also *Exhibit 29 – email removing Plaintiff from the case)*, and (9) feeling very betrayed by Hopkins and Clark for trusting them and then they write a review that could cost him his job after he had opened up about something so personal, acknowledged that he needed some help, and had even saved Clark back in 2020 when he missed a deadline and had a default judgment entered against Constable Rosen as a result in an F-5 case, but Plaintiff got it reversed for him.

While a negative performance review or improvement plan is not necessarily an adverse employment action, when it is based on pretext with the sole goal to force someone to resign, then it should be considered a adverse employment action.  In the section above, Plaintiff has laid out in detail the defects, exaggerrations and untruths in the Performance Review.  Most importantly, Clark admitted to Rea that they wanted Plaintiff gone. *Exhibit 28.*  Plaintiff should not have to wait to be terminated which would only make it more difficult to find another job.

Based on these facts, which each on their own, succeeds under *Hamilton*, it also lays out clear evidence that this was indeed constructive discharge.

**B.    Plaintiff more than meets his burden to establish his failure-to-accommodate claim under the ADA.**

To prevail on his failure-to accommodate claim, Plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential

limitations were known by the County; and (3) the County failed to make reasonable accommodations for such known limitations." *Amedee v. Shell Chem., L.P.*, 953 F.3d 831, 837 (5th Cir. 2020).

Defendant does not dispute that it knew of Plaintiff's disability and its consequential limitations; hence, element two is satisfied.

### 3. Plaintiff more than meets his burden to show that he was a "qualified individual" under the ADA.

As demonstrated in IV(A)(1) above, Plaintiff was a qualified individual with a disability because he has shown that he can perform the essential functions of the job despite his disability and that the Defendant's own evidence in Ms. Van Hoose's Performance Improvement Plan demonstrates at least one accommodation that could have been implemented.

### 4. Plaintiff more than meets his burden to show the Defendant failed to make reasonable accommodations for such known limitations.

### AND

### Defendant failed to engage in the interactive process in violation of the ADA and Defendant's own policies and procedures and Defendant did not grant any requested accommodations under the ADA.

Plaintiff incorporates the foregoing Key Facts section as if fully set out herein.

Defendant argues that Plaintiff's claim fails because Plaintiff "never" suggested a reasonable accommodation and they granted all his requests for protected FMLA leave and nothing else.  On December 8, 2021, Plaintiff sent an email to his supervisors, Hopkins, Clark and Hedge  notifying them of his disability and formal request for accommodation.  *Exhibit 17.*  He stated he was having great trouble concentrating due to a tremendous amount of personal stress and that it was impairing his ability to get his tasks done in a timely manner.  *Id.* He advised them that he can do work and had some successes just this week, but felt the need to ask for help.  *Id.*  He explained it was difficult to ask for the help and asked to start the flexible, interactive process to discuss this.  *Id.*

In response, Hopkins recommended to Plaintiff that he submit his request to Buchanan an HR generalist assigned to the Harris County Attorney's Office and Plaintiff did so on December 10, 2021.  *Exhibits 19 and 23.*  Hopkins (who is a pilot) also acknowledged that he knew when Plaintiff (a helicopter pilot) was grounded that indicated something was going on.  *Id. at page 51, line 14 – page 52, line 5.* Plaintiff sent an email to Buchanan advising her that he was requesting to start the process of ADA or FMLA accommodation, was having great trouble concentrating due to tremendous personal stress, it was impairing his ability to get his tasks done in a timely work, that he can work and had won cases just that week, he was looking for an accommodation, and wanted to start the flexible, interactive process.  *Exhibit*

*23.*

On December 13, 2021, Buchanan asked Plaintiff if he had any idea what type of accommodation he was seeking and Plaintiff responded that he wanted to discuss with his managers and medical providers, **but would seek an "accommodation about the particular type of work I am doing**." *Id.* So, Plaintiff did offer an accommodation to be discussed.

In December 2021, Hopkins, Clark and Buchanan were discussing Plaintiff's request in their own separate email chain. *Exhibit 22.* Hopkins had extensive ADA accommodations' request experience by virtue of having handled the largest and longest running ADA claim the state of Louisiana had ever had. *Exhibit 4, page 6, line 23 – page 7, line 12 and page 20, line 22 – page 21, line 9.* These email discussions are very telling as follows:

First, on December 16, 2021, Buchanan tells Hopkins and Clark that she is "unsure what accommodation Patrick is requesting and don't want to assume a disability," but she asks them to find out what he has to say and to follow-up with her as to provide an ADA accommodation form to assist with the interactive process. *Exhibit 22, HC 815-816.* Thereafter, Hopkins replies, "We can meet with him and discuss accommodations. What forms or other documentation do we need from your end? What are the steps in the process?" *Id. at HC 815.*

The next day Buchanan essentially stops Hopkins and Clark from reaching

out to Plaintiff when she writes, "My understanding is that Patrick is maybe going to reach out to you to discuss his work.  We have very little information from him at this time regarding his request to begin the interactive process.  I am waiting to receive his FMLA paperwork and can update you when I know more.  In the meantime, you can wait to see if Patrick reaches out to you or you can send him an email with something along the lines of 'Hi Patrick, We're just checking in with you.  Let us know if you have any questions about your work or if we can assist you in any way.'  Something like that.  If/when he reaches out to you, please just follow up with me … and we can discuss how to best move forward." *Id. at HC 814-815.*

Hopkins testified that he was instructed by Natalie DeLuca that his role was done for the time being after turned over to Buchanan.  *Exhibit 4, page 52, line 22 – page 53, line 16.*  Hopkins further stated in December 2021, his understanding was he was not to do anything regarding Plaintiff's FML or ADA accommodations requests and in January 2022, he was told not to be involved.  *Exhibit 4, page 106, line 1 – page 107, line 5.*  By February, Plaintiff was no longer under Hopkins' purview.  *Id.*  Hopkins never engaged in an interactive process with Plaintiff after being told to stand down.

Clark testified that he never engaged in an interactive process with Plaintiff.  *Exhibit 6, page 110, lines 10-19; page 121, lines 8-23; and page 122, lines 3-7.*

Buchanan could not identify anyone – not herself, Hopkins, Clark, DeLuca

or Hedge who sat down and discussed the matter and accommodations with Plaintiff.  *Exhibit 5, page 35, lines 2-22.*  Buchanan was also aware of the Harris County Interactive Process form that documents what is discussed between a supervisor and an employee who is seeking an accommodation, what accommodations were discussed, what accommodations are agreed upon or not agreed upon, and has a place for both the supervisor and the employee to sign.  *Id. at page 43, line 1 – page 45, line 17.*  Buchanan said this form was not completed for Plaintiff and if it had been done, then she would have been aware of it.  *Id.*

Defendant's policies and procedures regarding ADA states in relevant part, at Section 5, "If you need a reasonable accommodation, talk to your supervisor (which Plaintiff did).  Departments will engage in an interactive process with you to identify possible accommodations, if any, to help you do your job. (which they did not)."  *Exhibit 1 at HC 314.*  As shown above, everyone from Plaintiff's supervisors to the HR generalist Buchanan chose not to engage in an interactive process with Plaintiff to identify possible accommodations, if any, despite a clear policy and procedure that is mandated be done.  *Id.*

As shown above, at least at one point, Hopkins and Buchanan had the initial correct idea to sit down and discuss the matter with Plaintiff, but that stopped.  The question then becomes why?  Enter Natalie DeLuca ("DeLuca").  In December 2021, DeLuca held the title of Special Counsel.  *Exhibit 7, page 36, lines 11-22.*

Hedge, on December 16, 2021, suggested to Hopkins and Clark that they should defer heavily to DeLuca as to whether Plaintiff has a disability. *Exhibit 21 at HC 2714*. December 16, 2021, is the same day that Buchanan told Hopkins and Clark not to meet with Plaintiff. *Exhibit 22 at HC 814-815*. DeLuca refused to answer questions regarding what she instructed Buchanan to do or not to do based on attorney-client privilege. *Exhibit 7, page 75, lines 9-24*. DeLuca later became Plaintiff's supervisor, taking over Hopkins' position, in February 2022. *Id. at 36, lines 11-22 and page 37, lines 12-17*.

Sometime in mid-December, 2021, Buchanan sent Plaintiff Family Medical and Leave Act ("FMLA") forms to be completed and returned as they are referenced in a December 30, 2021, email to Plaintiff. *Exhibit 25*. These FMLA forms came from the Harris County Auditors Office. *Exhibit 5, page 18, lines 18-23*.

On December 30, 2021, Buchanan sent Plaintiff what she called ADA forms to be completed by Plaintiff and his doctor. *Exhibit 25*. These forms did not come from the Harris County Auditors Office which does not have ADA forms. *Exhibit 5, page 20, lines 14-25*. These forms are not referenced in the Defendants' Policies and Procedures Manual. *Exhibit 1, Section 5 at HC 314*. The Medical Certification form included does not reference that it is an ADA form anywhere in its title. *Exhibit 25 at 728*. Buchanan testified that she did not create the Medical Certification form, could not recall where the Medical Certification form came from

and that she was not aware of it having been used before.  *Exhibit 5, pae 20, lines 14-25*.

Plaintiff first saw psychiatrist, Darko Zdilar, M.D. on December 22, 2021, and informed Buchanan of this when she sent the ADA paperwork on December 30, 2021.  *Exhibit 20 at HC 223*.  Plaintiff advised that the next available appointment he could get was January 21, 2022, and would discuss the paperwork with the doctor at that time.  *Id.*

Knowing that he had a visit on January 21, 2024, and the possibility that a doctor may take longer to return information, on January 24, 2022, Buchanan sent Plaintiff an email that his request for accommodations under the ADA was being denied because his doctor had not returned the Medical Certification.  *Exhibit 28*. Buchanan stated the decision would be reconsidered if the form was returned by Plaintiff's doctor.  *Id.*  Plaintiff advised that the doctor said would get the paperwork back soon and he would let her know when he got it.  *Id.*

After having no one engage in the interactive process with Plaintiff to discuss accommodations and the anxiety rising, Plaintiff requested the only option he had of FMLA leave for February 28, to March 11, 2022 which was approved.  *Exhibit 35*.  This leave was approved based on Dr. Zdilar returning all of the paperwork, including the Medical Certification/ADA paperwork on February 25, 2022.  *Exhibit 34*.

Plaintiff had tried to discuss with Dr. Zdilar whether he could make a recommendation for a reasonable accommodation after laying out what I do as an attorney. *Exhibit 3, Page 172, line 16 to page 173, line 6.* Plaintiff was left with the impression that Dr. Zdilar did not want to make a recommendation on attorney work that he was not familiar with or what Plaintiff should and should not be working on. *Id.* This impression was accurate in that Dr. Zdilar was also confused by the paperwork and thought he was completing documentation for FMLA. *Exhibit 33.* In his Declaration and as laid out in detail above, Dr. Zdilar had no idea that the paperwork was for ADA because not clearly marked. *Id.*

Dr. Zdilar, in no way, understood that he was the decision maker in regard to any decisions to be made regarding accommodations to be provided under the ADA. *Id.* Rather, he believed that he was completing FMLA paperwork as described above. *Id.* Given that practicing law is a profession like practicing medicine with its own rules and ethical considerations, Dr. Zdilar was not then and is not now in a position to advise an attorney/patient/employee and his employer as to specific accommodations under the ADA that the attorney/employee needs or that are available regarding the practice of law. *Id.* This is something that should have been discussed and handled between Plaintiff and Defendant, both of whom were in the best position to determine appropriate accommodations. *Id.* Dr. Zdilar is simply not

knowledgeable enough in practicing law or the type of law Plaintiff practiced to have provided information beyond the need for leave under the FMLA. *Id.*

Dr. Zdilar did; however, provide significant information regarding Plaintiff's condition, that his progress was treatment dependent, and certainly enough information to merit a discussion and interactive process between Plaintiff and Defendant regarding appropriate ADA accommodations. *Id.*

Specifically, the information provided showed that Plaintiff had a disability, that it impaired his daily life activities, that recovery was treatment driven, and that Plaintiff needed an accommodation. *Exhibit 34.* Despite the information having been provided, as detailed above, no one at any time engaged in the interactive process with Plaintiff.

Despite all forms, including the Medical Certification form, having been completed and provided by Dr. Zdilar to Defendant in February 2024, DeLuca mistakenly reported in the Defendant's Position Statement she prepared and submitted to the Equal Employment Opportunity Commission ("EEOC") that Plaintiff never submitted the requested ADA documentation:

> As of January 24, 2022, Nagorski had still not returned the ADA certification. Accordingly, Nagorski's accommodation request was denied until such time as the requested documentation was provided ("This email is to inform you that your request for accommodation has been denied for failure to return the requested medical documentation. However, if you are able to complete the paperwork in the future we would be happy to reconsider."). Exhibit D. **To this date, Nagorski has never submitted the requested ADA documentation.**

*Exhibit 47.*

DeLuca's statement that Plaintiff never submitted the requested ADA documentation, i.e. the Medical Certification is not true as Buchanan testified. *Exhibit 5, page 58, lines 10-15 and page 60, lines 1-4.* As recently as her July 18, 2024 deposition, DeLuca continues to assert that she does not even know if Plaintiff had mental health conditons because she alleges Plaintiff never provided any medical documentation. *Exhibit 7 , page 107, line 13 to page 108, line 14.* As shown throughout this facts section, Dr. Zdilar did indeed send the medical documentation. *Exhibits 33 and 34.* Someone apparently provided this same incorrect information to Hopkins because he testified in his deposition that he felt there was no need for an interactive process because he also believed Plaintiff didn't follow through with his obligation to provide preliminary information. *Exhibit 4, page 147, line 22 to page 149, line 11.*

By the time the Plaintiff requested an accommodation he had fully disclosed his condition by explaining the extreme anxiety and stress he was experiencing, the source of his impairment, and how it was interfering with his ability to do his work. At that point, he triggered the Defendant's obligation to, in good faith, begin the interactive process in which an employer engages in "a meaningful dialogue with the employee to find the best means of accommodating that disability." *E.E.O.C. v.*

*Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009).  The process requires "communication and good-faith exploration." *Id*. (quoting *Kleiber v. Honda of Am. Mfg*., 485 F.3d 862, 871 (6th Cir. 2007).

As shown herein, Plaintiff never had a meaningful dialogue and there was no good-faith exploration.  Not one of Plaintiff's supervisors or Buchanan from HR ever had any discussion with Plaintiff to even exchange ideas of what could be done.  As shown above, with the Van Hoose Performance Improvement Plan, that was an option.  Discussing the types of cases Plaintiff would be assigned for a period of time, as he mentioned in December 2021 was an option.  However, no one had that conversation with Plaintiff.

Employers and employees must "work together in good faith, back and forth, to find a reasonable accommodation." *Id.* (citing *Chevron Phillips*, 570 F.3d at 621-22). The process should be "ongoing" and "reciprocal."  It should not end with "the first attempt at accommodation," but instead continue when the employee asks for a different accommodation or where the employer "is aware that the initial accommodation is failing and further accommodation is needed." *Id.* (citation and quotation marks omitted). The interactive process is not an "end in itself"—the question is whether an employer's unwillingness to engage in good faith leads to a failure to reasonably accommodate an employee. *Claiborne*, 690 F. App'x at 253.

The Eighth Circuit has found, that "Although there is no per se liability under the ADA if an employer fails to engage in an interactive process, we have previously noted that, for the purposes of summary judgment, the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith. Under these circumstances, we feel a factual question exists as to whether the employer has attempted to provide reasonable accommodation as required by the ADA." Craven v. Blue Cross And Blue Shield, 214 F.3d 1011, 1020 (8th Cir. 2000).

In our case, there was no real first attempt at accommodation even made besides allowing Plaintiff his protected FMLA leave which he was entitled to regardless.

## V.  CONCLUSION

Plaintiff has fully and complete come forward with specific and detailed facts showing a genuine fact issue for trial on all of Plaintiff's ADA claims.  Summary judgment should be denied.

## PRAYER

Plaintiff prays that Defendant's Motion for Summary Judgment should be denied in its entirety and for all such other and further relief to which Plaintiff may show he is justly entitled.

Respectfully submitted,

**THE GABBERT LAW FIRM**

/s/ *Allison H. Gabbert*

Allison H. Gabbert
Texas Bar No. 00795357
11511 Katy Freeway, Suite 610
Houston, Texas 77079
allison@thegabbertlawfirm.com
713-980-9012 Telephone
866-427-6768 Facsimile
*Attorney for Plaintiff Patrick Nagorski*

## CERTIFICATE OF SERVICE

I certify that on September 23, 2024, a true and correct copy of the above and foregoing pleading was served upon all attorneys of record pursuant to the Federal Rules of Civil Procedure.

Daniel N. Ramirez
Nalley I. Rodriguez, of counsel
Monty & Ramirez, LLP
150 W. Parker Rd., Third Floor
Houston, Texas 77076
dramirez@montyramirezlaw.com
nrodriguez@montyramirezlaw.com
281-493-5529 Telephone
281-493-5983 Facsimile
*Attorneys for Defendant Harris County, Texas*

/s/ *Allison H. Gabbert*

Allison H. Gabbert